**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION**


**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**         **PLAINTIFF**


**VS.**         **CIVIL ACTION NO. 3:06-cv-19-WHB-LRA**


**GENERAL MOTORS CORPORATION**         **DEFENDANT**


**<u>OPINION AND ORDER</u>**

This cause is before the Court on the Motion of Defendant General Motors Corporation for Summary Judgment.  The Court has considered the Motion, Response, Rebuttal, attachments to each, as well as supporting and opposing authorities as finds that the Motion is well taken and should be granted.


**I.  Background Facts and Procedural History**

Kristin Paige McGee ("McGee") began working for Kelly Services ("Kelly"), a temporary job placement service, in May of 2002.  At the time she was hired, McGee was instructed to report any acts of sexual harassment in the workplaces to which she was assigned directly to Kelly.  On or about May 13, 2002, McGee was assigned to the General Motors Service Parts Operation facility in Brandon, Mississippi ("Brandon facility").  At the time of McGee's assignment, General Motors Corporation ("General Motors") had implemented a sexual harassment policy, which was posted at the

Brandon facility.  The policy included instructions regarding the actions employees should take if they believed they had been sexually harassed.

McGee alleges that beginning on her first day of work, she was subjected to sexual harassment by Charles McBride ("McBride"), one of the managers at the Brandon facility.  The alleged harassment included that McBride: continually stared at McGee; would repeatedly appear wherever she was including the stairwells, elevator, outside the bathroom, and the parking lot; stated there was "finally someone here to look at" in reference to McGee; and called her into his office after Mother's Day weekend and asked whether her boyfriend did "anything special" for her, whether they had engaged in sexual relations, and whether she ever considered having sex with older men.  McGee apparently confronted McBride about this conduct in May of 2002, and he responded by saying that he did not believe he had done anything inappropriate.  McGee also went to her supervisor Catherine Rickett ("Rickett") and asked whether she had to continue working with McBride because she "didn't feel comfortable being around him," but did not explain the reasons why she felt uncomfortable.  Rickett responded by informing McGee that she needed to assist McBride or any other manager if they requested help on any project.  McBride's other alleged acts of harassment include that he:  twice told McGee she "had a nice butt" and that certain outfits made her "butt look good"; told her

2

"this is what I would want to do to you" while listening to a song with lyrics including "I'm going to make love to you over a desk"; twice placed his hand on McGee's leg and thigh when rising from a sitting position; asked whether she ever cheated on her boyfriend; commented on "how cute" she was; told her that her legs looked good when she was wearing skirts; and hugged or put his arm around her waist in an effort to hug her on several occasions. The last incident of alleged harassment occurred on July 24, 2002, when McBride came up behind McGee while she was sitting at her desk, placed his hands on her shoulders and kissed the top of her head.

On July 24, 2002, McGee approached Ken Wall ("Wall"), a supervisor for General Motors, and asked him whether temporary employees could use the toll-free number posted in the Brandon facility to report complaints of sexual harassment. McGee then informed Wall and Mike White ("White") of McBride's conduct. On July 25, 2002, White reported McGee's allegations to Joanne Pursley ("Pursley"), the Personnel Administrator at the Brandon facility. Pursley in turn contacted Kelly regarding the alleged harassment, and was instructed to not speak with McGee regarding this issue because McGee was a Kelly employee and it would investigate her claims. McGee was then called into Pursley's office and spoke with Apryl Stokes ("Stokes"), a manager for Kelly, who was already on the telephone. In accordance with Stokes's instructions, McGee reported to the Kelly office and wrote out a statement detailing McBride's alleged harassment.

Kelly began its investigation by interviewing the other Kelly employees who were assigned to the Brandon facility. Pursley attended those interviews, but she was not permitted to ask any questions. At least one other Kelly employee reported that McBride had made sexually inappropriate comments to her. At the conclusion of its investigation, Kelly found that there was insufficient evidence to show that McGee had been sexually harassed by McBride.

General Motors, through Pursley, also investigated McGee's claims by obtaining written statements from Wall and White, and interviewing another temporary employee at the Brandon facility. McBride was not in the office from July 25 through July 28, 2002. On July 29, 2002, McBride was called into the plant manager's office to meet with Pursley and Terry Armstrong (another supervisor at Brandon facility) to respond to McGee's allegations, which he denied. Pursley then spoke with the General Motors office in Grand Blanc, Michigan, and was instructed to continue the investigation into McGee's allegations and was told that McBride could remain at work during the investigation. While Pursley was speaking to the Grand Blanc office, McBride allegedly "freaked out," curled into a fetal position, threatened to kill himself, and began scratching at his face drawing blood. McBride was ultimately taken from the Brandon facility in an ambulance. Following the meeting, Pursley had McBride's security badge deactivated, which prevented him from returning to the facility. Following the July 29, 2002, meeting, McBride has been on medical leave and has not been interviewed

4

regarding McGee's allegations, and the investigation into McGee's claims was never concluded.  McGee continued in the employment with Kelly and continued to be assigned to General Motors.

In November 2002, management of the Brandon facility was informed by higher management of General Motors of the need to reduce the number of its temporary employees.  Thereafter, the management at the Brandon facility decided to consolidate the duties then being performed by McGee and another temporary employee LaShondra Moore ("Moore"), and to hire one higher-skilled, temporary employee to perform those duties.  On November 6, 2002, Pursley called Kelly regarding its decision to end McGee and Moore's assignments.  McGee's assignment at the Brandon facility ended on November 21, 2002.

On or about November 1, 2002, McGee filed a Claim of Discrimination with the Equal Employment Opportunity Commission ("EEOC").  The EEOC, upon finding merit in McGee's claims, filed a lawsuit on her behalf in this Court alleging claims of sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e *et seq.*  As the United States of America is a party to the lawsuit, and as the Complaint alleges claims arising under law, the Court may properly exercise federal subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1345 and 1331.  Defendant General Motors now moves for summary judgment on the claims alleged in the Complaint.

## II.   Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides, in relevant part, that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).   The United States Supreme Court has held that this language "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also, Moore v. Mississippi Valley State Univ., 871 F.2d 545, 549 (5th Cir. 1989); Washington v. Armstrong World Indus., 839 F.2d 1121, 1122 (5th Cir. 1988).

The party moving for summary judgment bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record in the case which it believes demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323.   The movant need not, however, support the motion with materials that negate the op-ponent's claim. Id.   As to issues on which the non-moving party has the burden of proof at trial, the moving party need only point

to portions of the record that demonstrate an absence of evidence to support the non-moving party's claim.  Id. at 323-24.  The non-moving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Id. at 324.

Summary judgment can be granted only if everything in the record demonstrates that no genuine issue of material fact exists. It is improper for the district court to "resolve factual disputes by weighing conflicting evidence, ... since it is the province of the jury to assess the probative value of the evidence." Kennett-Murray Corp. v. Bone, 622 F.2d 887, 892 (5th Cir. 1980).  Summary judgment is also improper where the court merely believes it unlikely that the non-moving party will prevail at trial.  National Screen Serv. Corp. v. Poster Exchange, Inc., 305 F.2d 647, 651 (5th Cir. 1962).

### III.  Legal Analysis

### A.  Sexual Harassment/Hostile Work Environment

McGee's sexual harassment claim is analyzed under the framework adopted by the United States Supreme Court in Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998) and Faragher v. City of Boca Raton, 524 U.S. 775 (1998).  As explained by the United States Court of Appeals for the Fifth Circuit in Casiano v. A T & T Corp., 213 F.3d 278, 283-84 , the first step under Ellerth

7

and Faragher is to determine whether the complaining employee has suffered a "tangible employment action."[1]   If such action has occurred, the lawsuit is classified as a 'quid pro quo' case, if it has not, the lawsuit is classified as one of 'hostile environment.' Id. at 283.   Here, McGee does not claim that she was fired, reassigned with significantly different responsibilities, or that General Motors made any decision that caused a significant change in her benefits secondary to the alleged harassment.   Accordingly, the Court finds, and the EEOC does not dispute, that hers is a hostile environment case.

As regards a hostile environment case, the next query is whether the complained of conduct constitutes "severe or pervasive sexual harassment."   Id. at 284 (citing Ellerth, 524 U.S. at 752; Faragher, 524 U.S. at 787–88).   If the conduct does not rise to the level of severe and pervasive, vicarious liability is not imputed to the employer under Title VII.   If, however, the conduct does rise to such level, "the employer is vicariously liable unless [it] can prove both prongs of the Ellerth/Faragher affirmative defense, to wit:   Absent a tangible employment action, (1) the employer exercised reasonable care to prevent and correct promptly any such sexual harassment, and (2) the employee unreasonably failed to take

---

[1]   A tangible employment actions "requires an official act of the enterprise, a company act," such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."   See Ellerth, 534 U.S. 761–62.

advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." Id. (citing Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 805).   To establish a hostile work environment claim, McGee must demonstrate: "(1) she is member of a protected group; (2) she was the victim of uninvited sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a "term, condition, or privilege" of [her] employment; and (5) her employer knew or should have known of the harassment and failed to take prompt remedial action." Harvill v. Westward Communications, L.L.C., 433 F.3d 428, 434 (5th Cir. 2005) (citing Woods v. Delta Beverage Group, Inc., 274 F.3d 295, 298 (5th Cir. 2001)).   The Court finds, based on the evidence before it, that McGee has satisfied the first three elements necessary to state a *prima facie* claim of sexual harassment.

To prove the fourth element, the Fifth Circuit has held:

> For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.   In determining whether an environment is "hostile" or "abusive" within the meaning of Title VII, courts look at the totality of the circumstances including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

Harvill, 433 F.3d at 434 (alterations in original) (citations omitted).   Additionally, "[f]or harassment to affect a term, condition, or privilege of employment, it must be both objectively and subjectively abusive." Hockman v. Westward Communications,

9

LLC, 407 F.3d 317, 326 (5th Cir. 2004) (citing Harris, 510 U.S. at 21-22)).   A plaintiff does not need to prove that the alleged harassment was both severe and pervasive, a showing on only one of these factors is sufficient to state a actionable claim of sexual harassment.  Id. at 434-35.

Reviewing the evidence in relation to the four factors identified above, the record shows that all of the alleged acts of harassment occurred between May 13, 2002, and July 24, 2002.[2] Although the alleged harassment did not occur on a daily basis, McGee testified that it occurred several times a week, and that she could not recall any conversation with McBride during which he did not make an inappropriate comment.  See Mot. for Summ. J., Ex. A (McGee Dep.), at 78, 125.  See also id. Ex. A (McGee Dep.), at 70 (testifying that McBride frequently traveled and was out of the office for periods ranging from one day to two weeks once or twice a month).  The record shows that the severity of McBride's alleged conduct ranged from repeated "deep stares," inappropriate comments regarding McGee's physical attributes, questions about her sexual relationship with her boyfriend, an implication that he wanted to make love to her over a desk, two episodes when he touched her thigh, one episode when he kissed the top of her head, several instances when he placed his arm around her waist and attempted to

---

[2]  McGee testified that she was not subjected to any further acts of harassment by McBride after she reported his conduct to Wall and White on July 24, 2002.  See Mot. for Summ. J., Ex. A (McGee Dep.), at 127-28, 135-36.

hug her, and constantly being "everywhere McGee went" in the Brandon facility.  Id. Ex. A (McGee Dep.), at 60.  As to the third factor, the Court has not been presented any evidence that the alleged harassment was physically threatening or humiliating.[3]  At most, McGee testified that McBride's conduct made her feel uncomfortable and that seeing his automobile in the parking lot made her "sick to her stomach."  See e.g. id. Ex. A (McGee Dep.), at 56, 70, 96.  Finally, as to the fourth factor of whether the alleged conduct "unreasonably interfered" with McGee's work performance, the record shows that on at least one occasion McGee was reduced to tears while working on a project with McBride, and that a supervisor at the Brandon facility described McGee as being "visibly shaken and scared" after her final encounter with McBride. See id. Ex. A (McGee Dep.), at 73-74, 76, 100.

After reviewing the totality of the circumstances underlying the hostile environment claim, the Court finds that there is sufficient evidence in the record to demonstrate a genuine issue of material fact as to whether the alleged harassment was sufficiently severe or pervasive so as to alter the conditions of McGee's employment and create an abusive working environment.

---

[3]  The EEOC alleges that McGee "was so intimidated and afraid of McBride that one evening she asked a co-worker to stay with her until McBride left the parking lot."  See Br. in Opp'n to Mot. for Summ. J., at 3.  The Court has not been cited to any evidence in the record to support this allegation.

Having found that there is a genuine issue of material fact as to whether the harassment alleged in the case *sub judice* rises to the level of "severe or pervasive", the Court next considers whether General Motors may nevertheless avoid liability for McBride's conduct under the Ellerth/Faragher affirmative defense. Again, to avail itself to this defense, General Motors must show that it exercised reasonable care to prevent and correct promptly sexual harassment, and that the employee unreasonably failed to take advantage of the preventative or corrective opportunities provided by the employer or to otherwise avoid harm. See Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 805.

In support of this defense, the record shows that McGee's employer Kelly had a sexual harassment and discrimination policy, which she was given when she was employed by that agency. See Mot. for Summ. J., Ex. A (McGee Dep.), at 44-46. Under the terms of this policy, McGee was required to report any alleged harassment of any kind directly to Kelly. Id. Ex. A (McGee Dep.), at 46. The record also shows that General Motors had implemented a policy against sexual harassment, which was in place at the time McGee was hired. See id. Ex. B (Pursley Dep.), at Exs. 3 & 4. Although McGee did not receive a copy of the General Motors policy when she was assigned to the Brandon facility, presumably because she was an employee of Kelly and was required to report claims of harassment directly to that agency, the policy and a toll-free telephone number that could be used to report claims of harassment was posted

at that facility.  Id. Ex. B (Pursley Dep.), at 35.; Ex. A (McGee Dep.), at 43, 91-95.   The General Motors Policy Against Sexual Harassment provides, in part:

> All [General Motors] employees are entitled to a work environment in which words and actions do not have even the appearance of disrespect.  Sexually-oriented jokes, cartoons, pictures, language, certain gestures and touching may be offensive to people and, therefore, may result in a hostile work environment.  This type of conduct will not be tolerated in the workplace.  General Motors facilities must be free of hostility resulting from sexually-oriented behaviors.  It is the responsibility of management and each employee to maintain an environment free of hostility.
>
> As in the case of other unfair employment practices, if you believe you have been subjected to sexual harassment, you may bring your concerns to the attention of either your immediate supervisor, personnel director or representative, or you may utilize appropriate and existing internal complaint procedures.

Id. Ex. B (Pursley Dep.), Ex. 4.

The record also shows that upon receiving McGee's complaint of sexual harassment, General Motors began prompt remedial actions.  McGee first complained of the alleged sexual harassment to Wall at approximately 3:45 p.m. on July 24, 2002.[4]  Id. Ex. A (McGee Dep.), at  94-95, 103.   After Wall related McGee's allegations to his supervisor White, McGee met with White and discussed the problems she was having with McBride.  Id. Ex. A (McGee Dep.), at 102-07.

---

[4]  The evidence shows that sometime before July of 2002, McGee told her supervisor Rickett that she did not feel comfortable working with McBride, but did not tell her the reason she felt uncomfortable or that she felt he was sexually harassing her.  See Mot. for Summ. J., Ex. A (McGee Dep.), at 89-91. Accordingly, McGee's conversation with Rickett did not place General Motors on notice of the alleged sexual harassment.

White then told McGee that he would report her allegations to Pursley, who was the Personnel Administrator at the Brandon facility. Id. Ex. A (McGee Dep.), at 108. White reported McGee's allegations to Pursley on July 25, 2002, and the latter immediately telephone Kelly and reported the alleged harassment. Id. Ex. B (Pursley Dep.), at 46. During this conversation, Pursley was instructed that she could not question McGee regarding her allegations because Kelly was responsible for investigating her complaint. Id. Ex. B (Pursley Dep.), at 45-46, 58-59. Additionally, while on the telephone with Kelly, Pursley summoned McGee to her office and the latter spoke on the telephone with Kelly, and confirmed her report of alleged sexual harassment. Id. Ex. A (McGee Dep.), at 113-14. Pursley was not in the room when McGee spoke with Kelly. Id. Ex. A (McGee Dep.), at 113. Thereafter, in accordance with the instructions she received from Kelly, McGee left the Brandon facility, went to the Kelly office in Brandon, Mississippi, and wrote a statement detailing McBride's alleged harassment. Id. Ex. A (McGee Dep.), at 114, 117-19. Kelly then began its investigation into the alleged harassment by interviewing its other temporary employees assigned to the Brandon facility. Pursley attended the interviews, but was not permitted to ask any questions. Id. Ex. B (Pursley Dep.), at 46, 61-63. General Motors, through Pursley, also conducted its own investigation by obtaining statements from Wall and White and interviewing at least one other temporary employee that had been

14

assigned to the Brandon facility by another agency.  Id. Ex. B
(Pursley Dep.), at 63, 65.

McBride was not in the office between July 25 and July 28,
2002.  Id. Ex. B (Pursley Dep.), at 74-75.  On July 29, 2002, while
her investigation was ongoing, Pursley met with McBride and he
denied McGee's allegations.  See id. Ex. B (Pursley Dep.), at 93,
96; Opp'n to Mot. for Summ. J., Ex. 2.  Pursley then spoke with the
General Motors office in Grand Blanc, Michigan, and was instructed
to continue the investigation into McGee's allegations and was told
that McBride could remain at work during the investigation. Opp'n
to Mot. for Summ. J., Ex. 2.  Before Pursley could relay this
information to McBride, he allegedly "freaked out," curled into a
fetal position, threatened to kill himself, and began scratching at
his face drawing blood. Id.  McBride was ultimately taken from the
Brandon facility in an ambulance.  See id. Ex. 2. Based on his
erratic behavior, Pursley had McBride's security badge deactivated,
which prevented him from returning to the facility.  Id. Ex. 2.

After the July 29, 2002, episode, McBride went on medical
leave that was certified by a treating physician.  Mot. for Summ.
J, Ex. B (Pursley Dep.), at 167.  Because McBride was on medical
leave, Pursley was unable to conduct the final step of her
investigation, which was to interview with McBride, tell him that
an investigation had been conducted, relate the findings of the
investigation, and give him the opportunity to make a rebuttal.
Id. Ex. B (Pursley Dep.), at 94, 191.  Once Pursley concluded her

investigation, she was required to send the information she had collected to corporate headquarters where the final decision regarding disciplinary actions would be made.  <u>Id.</u> Ex. B (Pursley Dep.), at 191-92.  Pursley also stated in her deposition that when asked, she told corporate headquarters that she believed McBride had sexually harassed McGee.  <u>Id.</u> Ex. B (Pursley Dep.), at 224. Finally, when asked whether corporate headquarters had advised her to take any action against McBride prior to his returning after medical leave, Pursley responded:

> No, because we can't do that when they're on sick leave.
>
> ....
>
> My understanding — I don't do it anyway, it would not have come from me.  I would not have been the one to terminate him.  That would have come from world headquarters.  And that my understanding is they were waiting for him to come back from sick leave.

<u>Id.</u> Ex. B (Pursley Dep.), at 225.

The record shows that although General Motors did not conclude its investigation into McGee's allegations or take any disciplinary actions against McBride because he has been on medical leave, that it did promptly and thoroughly investigate the alleged sexual harassment and was contemplating taking remedial actions against McBride upon his return.  The record also shows that McGee was not subjected to any further sexual harassment after she reported McBride's conduct on July 24, 2002, <u>see</u> <u>id.</u> Ex. A (McGee Dep.), at 128, 135-36, and that McBride never returned to active employment for General Motors after July 29, 2002.  <u>Id.</u> Ex. C, Response to

16

Interrogatory 1.  Accordingly, even though General Motors has been thus far precluded from taking any disciplinary actions against McBride because of his medical illness, the Court finds that General Motors nevertheless took prompt remedial actions in this case.  See e.g. Skidmore v. Precision Printing & Packaging, 188 F.3d 606, 615 (5th Cir. 1999) (finding that to be considered a "prompt remedial action", the employer's response to alleged sexual harassment must be "reasonably calculated" to end the harassment); Carmon v. Lubrizol Corp., 17 F.3d 791, 795 (5th Cir. 1994) (finding that an employer had taken prompt remedial measures because it took the allegations of harassment seriously, conducted a prompt and thorough investigation, and implemented remedial measures).  Based on the Policy Against Sexual Harassment implemented by General Motors, and its response to McGee's sexual harassment claim, the Court finds that General Motors did exercise reasonable care to prevent and promptly correct sexual harassment in the workplace, thus satisfying the first prong of the Ellerth/Faragher affirmative defense.[5]

---

[5]   In the Statement of Facts contained in the Brief filed by the EEOC in opposition to the Motion for Summary Judgment, the EEOC cites prior complaints of sexual harassment that had been made against McBride in 1999 and 2000.  The record shows that McBride received a verbal warning on October 5, 1999, after Pursley heard rumors that he was "hitting on" women in the plant. On August 3, 2000, McBride received a second verbal warning after it was learned that he asked several female General Motors employees, who were swimming at the hotel at which they were staying while attending a training seminar, to come out of the water so he could see their swimsuits.  McBride was specifically warned that another report of alleged harassment would result in

Second, the Court finds that McGee unreasonably failed to take advantage of any preventative or corrective opportunities provided by either Kelly or General Motors or to otherwise avoid harm. McGee acknowledges that she did not report the alleged harassment until July 24, 2002. Mot. for Summ. J., Ex. A (McGee Dep.), 94-95, 103. McGee further acknowledges that she received paperwork instructing her to report any complaint of sexual harassment in the workplaces to which she was assigned directly to Kelly at the time she was hired by that agency, and that the General Motors Sexual Harassment Policy and a toll free number for reporting claims of sexual harassment was posted at the Brandon facility. Id. Ex. A (McGee Dep.), at 43, 44-46, 92-93, 103. Additionally, once the alleged harassment was reported to General Motors, it immediately

_____

a formal investigation and possible written warning to his personnel file. Finally, on October 18, 2000, McBride received a written warning after Pursley learned that he approached one female employee and told her "I love the way you smell" and asked another female employee for a hug. In addition to the written warning, McBride was required to attend a seminar on sexual harassment and inappropriate behavior in the workplace, and went to one counseling session regarding his behavior. There are no further complaints of sexual harassment against McBride until McGee reported her allegations on July 24, 2002.

The Fifth Circuit has found that "[w]hat is appropriate remedial action will necessarily depend on the particular facts of the case – the severity and persistence of the harassment, and the effectiveness of any initial remedial steps." Skidmore, 188 F.3d at 615-16. The Court finds, as the prior allegations of sexual harassment against McBride were limited in their severity and were isolated occurrences, the remedial actions taken by General Motors was reasonable. Additionally, the record shows that these actions were initially effective as there were no complaints against McBride for approximately ten months after he received his first verbal warning in 1999, and for approximately twenty months after he received the written warning in 2000.

18

notified Kelly of McGee's allegations and began investigating her claim.

Based on the evidence before it, the Court finds that the EEOC has failed to show that there exists a genuine issue of material fact on either prong of the <u>Ellerth/Faragher</u> affirmative defense raised by General Motors.  Accordingly, the Court finds that General Motors may avail itself to this defense and that summary judgment in its favor on hostile environment claim is warranted.

**B.  Retaliation**

Claims of retaliation under Title VII are analyzed under the burden-shifting framework established by the United States Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973).  Under this framework, "the plaintiff carries the initial burden of establishing a prima facie case of retaliation." <u>Fierros v. Texas Dept. of Health</u>, 274 F.3d 187, 191 (5th Cir. 2001).  If the initial burden is carried, it "establishes an inference of retaliatory motive that the employer can rebut by producing evidence of a legitimate, non-retaliatory reason for the adverse action." <u>Id.</u> (citing <u>Evans v. City of Houston</u>, 246 F.3d 344, 354 (5th Cir. 2001).  "If the employer produces such evidence, then the plaintiff has the burden of proving that the Title VII protected activity 'was a 'but for' cause of the adverse employment decision.' <u>Id.</u> (quoting <u>Long v. Eastfield Coll.</u>, 88 F.3d 300, 305 n.4 (5th Cir. 1996)).  Thus, "[i]f the plaintiff presents evidence

supporting the *prima facie* case, plus evidence that the reasons given by the employer for the adverse employment action were pretextual, a jury may infer the existence of this "but for" causation.  Id. at 191-92 (alterations in original) (citations omitted).

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must demonstrate: "(1) that she engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse employment action." Evans, 246 F.3d at 352 (quoting Long, 88 F.3d at 304).  In the case *sub judice*, the EEOC has satisfied the first element of a *prima facie* claim of retaliation as McGee engaged in two activities protected under Title VII, reporting her complaint of sexual harassment on July 24, 2002, and filing her Charge of Discrimination with the EEOC on or about November 1, 2002.  The record also shows that McGee was subjected to an adverse employment decision as she was discharged from her assignment at the Brandon facility.  As regards the third factor, the retaliation claim is based on the following chronology of events:

July 24, 2002        McGee reported the alleged sexual harassment
                     to General Motors.

November 2002        During the monthly meeting of management,
                     which included the plant manager and various
                     supervisors of the Brandon facility and their
                     general director from Grand Blanc, Michigan,
                     office, the management of the Brandon facility
                     was told that "it was coming down ... that

everybody had to start reducing contract employees." Mot. for Summ. J., Ex. B (Pursley Dep.), at 232-33. During that meeting it was decided reduce the number of temporary employees by reorganizing the work functions at the Brandon facility. Id. Ex. B (Pursley Dep.), 232-33 & Ex. 26. The decision was made to end the assignments of McGee, who was classified as a Clerk 3 by Kelly, and another temporary employee Moore, who was classified as a Clerk 2, and fill their positions with one temporary employee who was classified as a Clerk 5. Id. Ex. B (Pursley Dep.), 232-33 & Ex. 26.

November 1, 2002     The EEOC received McGee's Charge of Discrimination.

November 6, 2002:    Pursley telephoned Kelly and advised the latter that the Brandon facility needed to reduce its number of contract employees and, therefore, it wanted to discharge McGee and Moore and replace them with a Clerk 5. Id. Ex. B (Pursley Dep.), at Ex. 26.

November 14, 2002    Pursley telephoned Kelly and advised that the Brandon facility would be making the changes in its clerical staff during the week of November 18, 2002. Kelly informed Pursley that it received a copy of the Charge of Discrimination filed by McGee. Id. Ex. B (Pursley Dep.), at Ex. 26.

November 14, 2002    General Motors received a copy of the Charge of Discrimination filed by McGee at 4:00 p.m. Id. Ex. B (Pursley Dep.), at Ex. 26.

November 21, 2002    McGee was discharged by General Motors. Id. Ex. A (McGee Dep.), at 164.

December 9, 2002     Clerk 5 level Kelly temporary employee was assigned to the Brandon facility. Id. Ex. B (Pursley Dep.), at Ex. 26.

Thus, the record shows that McGee was discharged approximately three months after reporting McBride's alleged harassment to General Motors. The Fifth Circuit has noted that a time lapse of

four months is sufficient to satisfy the "causal link" requirement for stating a *prima facie* case of retaliation.  See <u>Evans</u>, 246 F.3d at 354 (noting that "a lapse of up to four months has been found sufficient to satisfy the causal connection for summary judgment purposes.").  Accordingly, the Court finds that the EEOC has stated a *prima facie* claim of retaliation.

As the EEOC has made a *prima facie* showing of retaliation, the burden now shifts to General Motors which must produce evidence of a legitimate, non-retaliatory reason for discharging McGee.  On this issue, General Motors has presented evidence that McGee was discharged because of the decision of the management of the Brandon facility to reduce its number of temporary employees.  The Fifth Circuit has found that a reduction in force is a legitimate, non-discriminatory reason for termination.  See <u>Roberson v. Alltel Info. Servs.</u>, 373 F.3d 647, 656 (5th Cir. 2004).  General Motors has also produced evidence that in an effort to decrease the number of temporary employees, the Brandon facility reorganized the job functions of its clerks so that one, higher-level clerk would replace two lower level clerks.  Based on the evidence before it, the Court finds that General Motors has produced evidence of a legitimate, non-retaliatory reason for McGee's discharge.

Under the <u>McDonnell Douglas</u> framework, the EEOC now has the burden of proving that McGee's report of sexual harassment was the 'but for' cause of her discharge.  See <u>Septimus v. University of Houston</u>, 399 F.3d 601, 608 (5th Cir. 2005) (explaining: "This court

has consistently held that in retaliation cases where the defendant has proffered a nondiscriminatory purpose for the adverse employment action the plaintiff has the burden of proving that 'but for' the discriminatory purpose he would not have been terminated.") (alterations in original) (citations omitted).  On this issue, the EEOC has produced allegations, but no evidence, that General Motors retained other temporary employees in McGee's job classification after it discharged her.  In her deposition, McGee testified that she did not know whether she was classified as a Clerk 2 or Clerk 3 by Kelly, and there is no evidence that McGee knew the classification of any of the temporary employees who remained at the Brandon facility.  Mot for Summ. J., Ex. A (McGee Dep.), at 159.  The record also shows that after McGee and Moore were discharged from their Clerk 3 and Clerk 2 positions, respectively, a Clerk 5 was assigned to the Brandon facility.  Id. Ex. B (Pursley Dep.), at Ex. 26.

Based on the evidence before it, the Court finds that the EEOC failed to show that there exists a genuine issue of material fact as to whether the legitimate, non-discriminatory reason articulated by General Motors for McGee's discharge was pretextual. Accordingly, the Court finds that General Motors is entitled to summary judgment on the retaliation claim.

## IV.  Conclusion

For the foregoing reasons:

IT IS THEREFORE ORDERED that the Motion of Defendant General Motors Corporation for Summary Judgment [Docket No. 41] is hereby granted.  A Final Judgment dismissing this case with prejudice shall be entered.

SO ORDERED this the 4th day of September, 2007.


s/ William H. Barbour, Jr.
UNITED STATES DISTRICT JUDGE